**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WILLIAMS & CONNOLLY LLP,

　　　　　　　*Plaintiff*,

　　v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, et al.,

　　　　　　　*Defendants*.

**Case No. 24-2322-PLF**
**(ORAL ARGUMENT REQUESTED)**

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

I.     Plaintiff's FOIA Requests.........................................................................................2

     A.     Reza Zarrab ...................................................................................................2

     B.     Hüseyin Korkmaz .........................................................................................8

II.    Procedural History ................................................................................................10

     A.     The U.S. Customs & Border Protection Request....................................10

     B.     The U.S. Citizenship & Immigration Services Request .........................11

     C.     The U.S. Immigration & Customs Enforcement Request.......................12

ARGUMENT .................................................................................................................15

I.     CBP and USCIS Improperly Withheld Records Under FOIA.............................16

     A.     The *Glomar* Response Issued by CBP and USCIS Is Improper ...........16

     B.     CBP and USCIS Are Improperly Withholding Documents with Respect to Reza Zarrab Pursuant to FOIA's Privacy Exemptions ...........................18

           1.     Reza Zarrab's Privacy Interests Are Minimal at Best ..............20

           2.     There Is a Substantial Public Interest in Disclosure .................22

     C.     CBP & USCIS Are Improperly Withholding Documents with Respect to Hüseyin Korkmaz Pursuant to FOIA's Privacy Exemptions................26

           1.     Hüseyin Korkmaz's Privacy Interests Are Diminished to Non-Existent ......................................................................................26

           2.     There Is a Substantial Public Interest in Disclosure .................27

     D.     Defendant CBP May Redact Information Subject to Exemption 7(E)................28

II.    CBP and USCIS Have Failed To Perform An Adequate Segregability Analysis. ...........28

III.   ICE Failed To Conduct An Adequate Search. ....................................................29

CONCLUSION ...............................................................................................................34

# TABLE OF AUTHORITIES

**Page**

## CASES

*ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2013)................................................................17

*ACLU v. U.S. DOJ*, 655 F.3d 1 (D.C. Cir. 2011)................................................19, 22

*Am. First Legal Found. v. U.S. DHS*,
    No. 21-2168, 2024 WL 4932041 (D.D.C. Dec. 2, 2024)...................................19, 23

*Am. Immigr. Council v. U.S. ICE*, 464 F. Supp. 3d 228 (D.D.C. 2020) ...........................31

*Am. Immigr. Council v. U.S. CBP*, 590 F. Supp. 3d 306 (D.D.C. 2022) ......................15

*Am. Oversight v. DHS*, 691 F. Supp. 3d 109 (D.D.C. 2023) .......................................32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................15

*Armstrong v. Exec. Off. of the President*, 97 F.3d 575 (D.C. Cir. 1996).......................29

*Bagwell v. U.S. DOJ*, 311 F. Supp. 3d 223 (D.D.C. 2018)...........................................32

*Bartko v. U.S. DOJ*, 898 F.3d 51 (D.C. Cir. 2018)...............................................17, 18

*Bennett v. DEA*, 55 F. Supp. 2d 36 (D.D.C. 1999) .....................................................22

*Campbell v. U.S. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) .................................................26

*Citizens for Resp. & Ethics in Wash. v. U.S. DOJ*,
    840 F. Supp. 2d 226 (D.D.C. 2012)........................................................19, 20, 22

*Citizens for Resp. & Ethics in Wash. v. U.S. DOJ (CREW III)*,
    746 F.3d 1082 (D.C. Cir. 2014)................................................................22, 24, 25

*Davis v. DOJ*, 460 F.3d 92 (D.C. Cir. 2006) ..............................................................26

*Gahagan v. U.S. CBP*,
    No. CIV.A. 14-2619, 2015 WL 3772888 (E.D. La. June 17, 2015)..........................30

*Gov't Accountability Project v. U.S. DHS*, 335 F. Supp. 3d 7 (D.D.C. 2018) .............32

*Hamdan v. U.S. DOJ*, 797 F.3d 759 (9th Cir. 2015) ..................................................29

*Heritage Found. v. U.S. DHS*,
    No. 1:23-cv-01198, 2024 WL 4263929 (D.D.C. Sept. 23, 2024)............................25

*Inst. for Pol'y Stud. v. CIA*, 885 F. Supp. 2d 120 (D.D.C. 2012) ...............................17

Page

**Cases—cont'd:**

*Iowa Citizens for Cmty. Improvement v. USDA*, 256 F. Supp. 2d 946 (S.D. Iowa 2002) ............22

*Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771 (D.C. Cir. 2002) ..........................29

*Jordan v. De George*, 341 U.S. 223 (1951) ................................................................24

*Jud. Watch, Inc. v. U.S. DOJ*, 394 F. Supp. 3d 111 (D.D.C. 2019)....................................21, 22

*Jud. Watch, Inc. v. U.S. DOJ*,
      No. 00-745, 2001 U.S. Dist. LEXIS 25731 (D.D.C. Feb. 12, 2001) ................................21, 23

*Jud. Watch, Inc. v. U.S. Dep't of State*,
      No. CV 20-1729, 2022 WL 4094069 (D.D.C. Sept. 7, 2022) ................................32

*Lissner v. U.S. Customs Serv.*, 241 F.3d 1220 (9th Cir. 2001) ......................................22

*McRae v. U.S. DOJ*, 869 F. Supp. 2d 151 (D.D.C. 2012) ......................................16, 28

*Mead Data Cent. v. U.S. Dep't of the Air Force*, 566 F.2d 242 (D.C. Cir. 1977)........................29

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011).................................................................15

*Muchnick v. DHS*, 225 F. Supp. 3d 1069 (N.D. Cal. 2016)....................................21, 23, 24, 25, 28

*New Orleans Workers' Ctr. for Racial Just. v. U.S. ICE*,
      373 F. Supp. 3d 16 (D.D.C. 2019) ................................................................31

*Organized Cmtys. Against Deportations, Immigr. Def. Project v. U.S. ICE*,
      No. 21-CV-2519, 2024 WL 2053123 (N.D. Ill. May 8, 2024)................................32

*Owen v. U.S. ICE*, No. 2:22-cv-00550, 2024 WL 5339162 (C.D. Cal. Nov. 12, 2024)...............32

*Phillips v. ICE*, 385 F. Supp. 2d 296 (S.D.N.Y. 2005)....................................................24

*Project for Priv. & Surveillance Accountability, Inc. v. U.S. DOJ*,
      633 F. Supp. 3d 108 (D.D.C. 2022)................................................................17

*Prop. of the People, Inc. v. OMB*, 330 F. Supp. 3d 373 (D.D.C. 2018) .......................15

*Providence J. Co. v. FBI*, 460 F. Supp. 778 (D.R.I. 1978)............................................21

*Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898 (D.C. Cir. 1999)........................16

*Rosenfeld v. U.S. DOJ*,
      No. C-07-3240 EMC, 2012 WL 710186 (N.D. Cal. Mar. 5, 2012)................................20, 22

**Page**

**Cases—cont'd:**

*Roth v. U.S. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ...................................................19, 22

*Ryan v. FBI*, 113 F. Supp. 3d 356 (D.D.C. 2015)........................................................33

*Schrecker v. U.S. DOJ*, 349 F.3d 657 (D.C. Cir. 2003)................................................26

*Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728 (D.C. Cir. 2008)........................19

*Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999)............29

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990)........................................................29, 30

*U.S. DOD v. Fed. Lab. Rels. Auth.*, 510 U.S. 487 (1994)............................................................19

*Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) ...........................30, 33, 34

## STATUTES AND RULE

5 U.S.C.
    § 552(a) ............................................................................................................16
    § 552(b) ..................................................................................................... *passim*

8 U.S.C. § 1182(a) ...............................................................................................23

Fed. R. Civ. P. 56(a) ...........................................................................................15

## INTRODUCTION

Customs & Border Protection, U.S. Citizenship & Immigration Services, and Immigration & Customs Enforcement are entrusted with the proper enforcement of the country's immigration laws. But this "trust" comes with the public's ability to "verify" through the Freedom of Information Act. Plaintiff, Williams & Connolly LLP, sought to do just that when it requested the immigration records of Reza Zarrab and Hüseyin Korkmaz.[1]

Originally a citizen of Iran, as well as Türkiye and North Macedonia, Zarrab has pleaded guilty to multiple federal felonies in the United States. Korkmaz—a now-deceased Turkish citizen and fugitive from justice in Türkiye—stole documents from the Turkish government and smuggled them into the United States using a fake passport. Neither of these individuals are U.S. citizens. And both of these individuals willingly thrust themselves—and their immigration statuses—into the public spotlight when they agreed to testify in a highly publicized trial in the Southern District of New York in order to obtain benefits from the U.S. Government. Anyone who bothers searching their names on the internet can easily learn the details of their crimes. And yet, following their testimony, and Zarrab's guilty plea, both were allowed to remain in the United States, even though they are not U.S. citizens.

The public has a right to know why CBP, USCIS, and ICE have permitted these admitted law-breakers to remain in the United States. Plaintiff is therefore entitled to partial summary judgment and the prompt release of the records it seeks.

---

[1] Williams & Connolly LLP represents Türkiye Halk Bankası A.Ş. (Halkbank) in ongoing criminal proceedings in the Southern District of New York where Reza Zarrab and Hüseyin Korkmaz (via deposition) are expected to testify on behalf of the prosecution. *See* Case No. 15-867-RMB (S.D.N.Y.). Although Williams & Connolly LLP represents Halkbank, it stands in the shoes of any member of the public when seeking records under FOIA.

## BACKGROUND

### I.      Plaintiff's FOIA Requests

This action is brought under the Freedom of Information Act.  It seeks records and documents related to Reza Zarrab and Hüseyin Korkmaz from U.S. Customs & Border Protection, U.S. Citizenship & Immigration Services, and U.S. Immigration & Customs Enforcement.[2]

### A.      Reza Zarrab

Reza Zarrab, a/k/a Riza Zarrab, a/k/a Reza Sarraf, a/k/a Riza Sarraf, a/k/a Aaron Goldsmith, a/k/a Richard Ferrari is known today as one of the "most prolific money launderers" of the twenty-first century.[3]  Ex. 1 (*United States v. Atilla*, No. 15-867, Tr. at 1314 (Korkmaz)). A citizen of Iran, Türkiye, and North Macedonia, Zarrab has pleaded guilty to multiple felonies in the United States, including money laundering and bank fraud.  Ex. 15 (*Atilla* Tr. at 260, 264 (Zarrab)).  And yet, since his guilty plea, he has principally been residing in Florida, living a life of luxury, and allegedly engaging in the same schemes for which he was indicted.[4]  His opulent lifestyle is a focus of the press both here and abroad, but what remains unknown is why CBP, USCIS, and ICE have allowed him to remain in the United States.

Dubbed the "Turkish Gatsby," Zarrab first rose to prominence in the early 2010s when he started dating Turkish pop star and *The Voice Türkiye* coach, Ebru Gündeş, while living in Türkiye.[5]  Their relationship and eventual marriage was frequently covered in the press in part

---

[2] The instant suit also involves claims against the U.S. Department of State and U.S. Department of Treasury; however, this motion does not concern those defendants.

[3] OCCRP, *Frequently Asked Questions: Who is Reza Zarrab?*, OCCRP (Apr. 27, 2021), https://tinyurl.com/3r5tzu8v [Ex. 2]; Kelly Bloss et al., *Money Launderer for Iran, Dubbed 'the Turkish Gatsby' Enjoys Lavish Life in Miami*, Mia. Herald (Apr. 5, 2023), https://tinyurl.com/3yhtpyfz [Ex. 3].

[4] *See* Ex. 3 (Bloss et al., *Money Launderer for Iran*).

[5] *E.g.*, *Ebru Gündeş'in Evliliğiyle Ilgili Şok Iddia [Shocking Claim About Ebru Gündeş's Marriage]*, Patronlar Dünyası (June 4, 2012), https://tinyurl.com/dx2ka8dm [Ex. 4]; Larry Neumeister, *Feds Say Turkish Celebrity Who Faces Prison Is a Flight Risk*, AP News (May 25,

because of the extravagant gifts Zarrab purchased for his wife, including a private jet, show horses, cars, and expensive art.[6]  Indeed, as one article described it, Zarrab enjoyed the public attention he received each time he purchased her an extravagant gift; he proposed to her by writing on the walls of his house, a grand gesture sure to receive attention.[7]  Tabloids and gossip magazines often covered the couple's luxurious lifestyle, including their "six expensive racehorses, 17 luxury cars, more than $10 million in artwork, 24 firearms used by his security detail, and 20 properties in his name with three more held through his business or family."[8]  Zarrab even dabbled in songwriting, selling his songs to famous artists, including a famous ex-girlfriend.[9]

In March 2016, Zarrab was arrested by federal law enforcement (in coordination with CBP) as soon as he stepped off his private jet in Florida.[10]  Days later, the U.S. Attorney's Office in the Southern District of New York unsealed a lengthy indictment against Zarrab.[11]

Facing decades in prison, Zarrab pleaded guilty to seven federal crimes: (i) conspiracy to

---

2016), https://tinyurl.com/568muh67 [Ex. 5]; Nate Raymond, *U.S. Arrests Turkish Businessman Accused of Evading Iran Sanctions*, Reuters (Mar. 21, 2016), https://tinyurl.com/cacdf6k9 [Ex. 6]; Ex. 3 (Bloss et al., *Money Launderer for Iran*); Ex. 2 (OCCRP, *Who is Reza Zarrab?*).  For any Turkish-language articles cited, an English-language version is appended as generated by the "Google Translate" extension on the Chrome browser.

[6] *See, e.g.*, *Kocam bana Mars'ı da alacak [My Husband Will Buy Me Mars Too]*, Milliyet (May 21, 2012), https://tinyurl.com/4pwskyw7 [Ex. 7]; *Zarrab Bought it for Ebru Gündeş*, Haber Turk (Dec. 19, 2013), https://tinyurl.com/5z7kmzmn [Ex. 8]; *Gözaltı Öncesi 1 Milyonluk Hediye! [A Gift of 1 Million Before Detention!]*, Haber Turk (Dec. 17, 2013), https://tinyurl.com/5tyhar4k [Ex. 9].

[7] *Yetenekli Bay Reza [Talented Mr. Reza]*, Kelebek (Dec. 22, 2013), https://tinyurl.com/5ebw3ahh [Ex. 10].

[8] Tom Stocks et al., *Reza Zarrab: The Money Launderer Who Wanted to Be Jacques Cousteau*, Courthouse News Serv. (Sept. 20, 2020), https://tinyurl.com/re2amdet [Ex. 11].

[9] *See* Ex. 10 (Kelebek, *Talented Mr. Reza*).

[10] Larry Neumeister, *Lawyer: US Plotted to Get CellPhone in Turkish Man's Arrest*, AP (Oct. 5, 2016) [Ex.12].  Tracy Connor, *Reza Zarrab Takes the Stand in Trial Straining U.S.-Turkish Ties*, NBC News (Nov. 29, 2017), https://tinyurl.com/mw7yta9j [Ex. 13].

[11] Press Release, U.S. Dep't of Just., Off. of Pub. Affs., Turkish National Arrested for Conspiring to Evade U.S. Sanctions Against Iran, Money Laundering and Bank Fraud (Mar. 21, 2016), https://tinyurl.com/3e4zfts3 [Ex. 14].

impede the Treasury Department's enforcement of Iranian sanctions; (ii) conspiracy to violate the International Emergency Economic Powers Act; (iii) bank fraud; (iv) conspiracy to commit bank fraud; (v) money laundering; (vi) conspiracy to commit money laundering; and (vii) conspiracy to bribe a U.S. public official and possessing contraband in a federal detention center.  Ex. 66 (Zarrab Plea Agreement).

In exchange for leniency, Zarrab agreed to serve as the key witness in the trial against Mr. Mehmet Hakan Atilla, a former Deputy General Manager of Halkbank, in *United States v. Atilla*, No. 15-867 (S.D.N.Y.) (R. Berman, J.).  In testimony that spanned nearly seven days, Zarrab revealed numerous details about his personal life, financial dealings, and criminal acts— everything from his flight from Türkiye to the United States, to how he managed to move Iran's oil and gas proceeds to accounts he controlled in Dubai.  *See generally* Ex. 15 (*Atilla* Tr. (Zarrab)). The trial, and Zarrab's testimony in particular, received extensive coverage,[12] including live reporting on Twitter.[13]  News reporters filled the courthouse benches and reported every detail.[14]

Following the trial, Zarrab continued to remain in the public eye and continued to post numerous "stories" to his public Instagram account.[15]  In two such "stories," his followers watched

---

[12] *See, e.g.*, Benjamin Weiser, *Reza Zarrab, Turk at Center of Iran Sanctions Case, Is Helping Prosecution*, N.Y. Times (Nov. 28, 2017), https://tinyurl.com/yymd6w6h [Ex. 16]; *Reza Zarrab Case: Turkey Seizes Assets of Trader in US Trial*, BBC (Dec. 1, 2017), https://tinyurl.com/e5j36v8c [Ex. 17]; Dexter Filkins, *A Mysterious Case Involving Turkey, Iran, and Rudy Giuliani*, New Yorker (Apr. 14, 2017), https://tinyurl.com/57pbrm3u [Ex. 18]; Elif Key, *Reza Zarrab Tanık Kürsüsünde: New York'taki Adliyede Neler Yaşandı? [Reza Zarrab on the Witness Stand: What Happened in the New York Courthouse?]*, BBC News Turkey (Dec. 4, 2017), https://tinyurl.com/mr4xbhsy [Ex. 19].

[13] *Disappointed by Media, Turks follow US Trial on Twitter*, RFI (Jan. 12, 2017), https://tinyurl.com/5n8v79d6 [Ex. 20].

[14] Ex. 19 (Key, *Witness Stand*).

[15] *Yeni Sedat Peker Zarrab Mı [Is the New Sadat Peker, Zarrab?]*, ODA TV (Nov. 26, 2022), https://tinyurl.com/yms7w7fd [Ex. 21]; *Hadise Reza Zarrab Ifşası Için Ifade Verdi Ebru Gündeş'i Şahit Gösterdi! Seren Serengil: "Ebru'ya Sormadan Yazdım" Ortalık Karışacak [Hadise Testified for the Reza Zarrab Revelation and Showed Ebru Gündeş as a Witness! Seren Serengil: "I Wrote*

as he threatened to release audio recordings and videos after a Turkish TV presenter and actress publicly criticized him for having an affair years ago.[16]  Zarrab also created a Facebook account under his new alias, Aaron Goldsmith, and encouraged his followers to follow his new company, the Next Level Performance Center, a leading horse training facility in Florida.[17]

Since then, Zarrab has been promoting his business at horse events around the country.[18] And the company in turn, has showcased Zarrab on its Facebook account.[19]  Now a competitive horse owner, Zarrab's horses have been featured in equestrian magazines, including his company's Sonata MF, which received a national title in 2021.[20]  As chronicled in the Miami Herald and the internet, Zarrab himself has travelled across the United States competing in championship races.[21]






*Florida*[22]                                    *Montana*[23]

---

*Without Asking Ebru" Things Will Get Messy]*, Takvim (Oct. 6, 2023), https://tinyurl.com/bde97yvw [Ex. 22].

[16] *Id.*

[17] Aaron Goldsmith, Facebook, https://tinyurl.com/vyvj4xpy [Ex. 23].

[18] Aaron Goldsmith, Facebook, https://tinyurl.com/ycya2psa [Ex. 24].

[19] Next Level Performance Center, Facebook, https://tinyurl.com/3nb3yumx [Ex. 25].

[20]  Annan Hepner, *Next Level Performance Center's Sonata MF Wows Judges to Win Markel/USEF Six-Year-Old Dressage National Championship with Madeleine Bendfeldt*, PS Dressage (Aug. 29, 2021) [Ex. 26].

[21] Ex. 3 (Bloss et al., *Money Launderer for Iran*).

[22]  Becky Pearman Photography, Photograph of Reza Zarrab, https://beckypearman.smugmug.com/.

[23] *Id.*





*South Carolina*[24]                                          *Tennessee*[25]

Today, Zarrab remains in the United States a free man.  Media reports suggest that Zarrab still has access to, and employs, the very funds and networks he used to commit the crimes to which he pleaded guilty in order to maintain a life of luxury in Miami.[26]  As one article in 2023 described it, "Zarrab is living the good life," as evidenced by images they published of his riding a sleek show horse, his $1.2 million commercial riding stable, and his lavish living arrangements, including (at the time) a Florida condo with a list price of $3.65 million.[27]

Zarrab, is not only free, he remains a public figure in the United States and in Türkiye.[28] Just this past June, Zarrab made headlines when it was reported that he married Turkish socialite

---

[24] *Id.*
[25] *Id.*
[26] *See, e.g.*, Ex. 3 (Bloss et al., *Money Launderer for Iran*).
[27] *Id.*; *see also* Ex. 11 (Stocks et al., *Money Launderer Who Wanted To Be Jacques Cousteau*).
[28] Ex. 3 (Bloss et al., *Money Launderer for Iran*).

Dilara Altıntop.[29]  Zarrab quickly rebutted these rumors by posting "stories" to his public Instagram account, which includes tens of thousands of followers.[30]  These public reports were likely premature, as less than a month ago, tabloids, news articles, and social media posts reported that Zarrab married Altıntop in a three-day, three-night affair.[31]  Several articles detailed his Miami wedding, describing everything from the celebrity guest list to the ice sculptures, custom wedding gowns, and table decorations.[32]



Although much is known about Zarrab's crimes and lifestyle, to date, what remains yet to be determined is whether U.S. authorities—and in particular CBP, USCIS, and ICE—complied with their obligations to enforce the nation's immigration laws

---

[29] *Reza Zarrab Ortaya Çıktı: Bursalı Sosyetikle Evlendi [Reza Zarrab Emerged: He Married A Socialite from Bursa]*, ODA TV (June 17, 2024), https://tinyurl.com/4pm344pk [Ex. 27].
[30] Elif Demirtas, *Dilara Altıntop Ile Evlilik Iddialarına Reza Zarrab'dan Net Cevap [A Clear Response from Reza Zarrab to the Allegations of Marriage with Dilara Altıntop]*, MaviKadin (June 18, 2024), https://tinyurl.com/mr32thr2 [Ex. 28]; Decl. of Omer Er [Ex. 37].
[31] *See, e.g.*, *Reza Zarrab ve Dilara Altıntop Miami'de Evlendi Mi? İşte Detaylar! [Did Reza Zarrab and Dilara Altıntop Get Married in Miami? Here Are the Details!]*, Ilkhaber (Jan. 18, 2025), https://tinyurl.com/yswd4we4 [Ex. 29]; @ilkhaberadana, X.com (Jan. 18, 2025, 5:10AM), https://tinyurl.com/3hkd64mp [Ex. 30]; @entertainmentturkiye, Instagram, https://tinyurl.com /jjsxepsj.
[32] *See, e.g.*, *Reza Zarrab, Miami'de 3 Gün 3 Gece Süren Düğünde Evlendi . . . Türkiye'den Ünlü Yağdı [Reza Zarrab Got Married in A 3-Day, 3-Night Wedding In Miami . . . Celebrities Flocked from Turkey]*, Sözcü (Jan. 19, 2025), https://tinyurl.com/4apvs66n [Ex. 31]; *Former Sanctions Case Figure Zarrab Weds in Miami Spectacle*, Türkiye Today (Jan. 18, 2025), https://tinyurl.com/57pjunjh [Ex. 32].

evenhandedly when they granted him the ability to remain in the United States.  It appears not.

Zarrab has received some type of favorable treatment from our nation's immigration agencies.  As

reported by the Organized Crime &
Corruption Reporting Project
(OCCRP)—a non-profit organization
funded in part by the U.S.
government—his employment
authorization card issued under the
name "Aaron Goldsmith" notes the



category "C14."[33]  That designation corresponds with a grant of "deferred action" or a decision by

the immigration authorities to defer deportation in his case.[34]

It remains unclear, however, what other immigration benefits he has received and whether

the immigration and customs agencies of the United States complied with their statutory duties by

permitting a noncitizen, who is an admitted felon, to remain in the United States.

**B.    Hüseyin Korkmaz**

Hüseyin Korkmaz, who recently died from cancer, was also widely known in Türkiye.[35]

He was a former Turkish police officer there who investigated Reza Zarrab.  Ex. 1 (*Atilla* Tr. at

---

[33] *See OCCRP ID: How Our Research Team Supports Investigative Journalists Around the World*,
Medium (Jan. 21, 2022), https://tinyurl.com/mryp95h5 [Ex. 33].  The OCCRP's donors include
(among others) the U.S. Agency for International Development ("USAID") and the U.S.
Department of State.  *Supporters*, OCCRP (last visited Feb. 13, 2025), https://tinyurl.com/
3a55txcd.

[34] *Frequently Asked Questions: CIS Ombudsman*, U.S. DHS (Feb. 11, 2025),
https://tinyurl.com/bdsh72w5.

[35] *See, e.g.*, *Turkey Prepares Extradition Request for Former Police Investigator in US*, Hurriyet
Daily News (Jan. 5, 2018), https://tinyurl.com/yc8c758p [Ex. 34].

1278 (Korkmaz)).[36]   Korkmaz was eventually fired from his post and charged with multiple crimes.  *Id.* at 1391-92, 1728.  But before he could face trial in Türkiye, he fled to the United States, taking with him some of the evidence collected during the investigation.  *Id.* at 1796-97.

Lacking a passport, Korkmaz first hired a smuggler to leave Türkiye before he traveled through a series of countries without authorization.  *Id.* at 1389, 1736-37.  Then—having been told by U.S. authorities that he could not travel to the United States without a passport—he lied to officials in an unknown country to obtain a passport under a false name.  *See id*. at 1383-84, 1389-90.

Upon arrival in the United States, Korkmaz handed the stolen evidence to the FBI, which reimbursed him $50,000 for his travels.[37]   Like Zarrab, Korkmaz agreed to testify against Mr. Atilla in a high-profile trial.  *See generally* Ex. 1 (*Atilla* Tr. (Korkmaz)).

During his four days on the stand, Korkmaz narrated details of his supposed involvement in the Turkish investigation, as well as personal details about his journey to, and life in, the United States.  *See generally id.*  He admitted to stealing evidence from Türkiye—a NATO ally—and smuggling it into this country.  *Id.* at 1386-88.  And in spite of having used a false passport to enter the country, he explained that he was granted work authorization to obtain employment.  *Id.* at 1564.

This testimony was widely reported in the United States and abroad, including through live

---

[36] Benjamin Weiser, *Officer Said He Fled Turkey, Carrying Evidence of Corruption*, N.Y. Times (Dec. 11, 2017), https://tinyurl.com/2amy77jc [Ex. 35].

[37] Adem Yavuz Arslan, *"Kral Çiplak" Diyen Polis Anlatiyor [The Police Man Who Said 'The King Is Naked" Explains]*, YouTube (Jan. 26, 2025), https://tinyurl.com/2mwz2kzc; Ex. 37 (Decl. of Omer Er); *Gülenist Korkmaz Confesses to Violating Turkish Law Multiple Times*, Daily Sabah (Dec. 14, 2017), https://tinyurl.com/ym4zh44j [Ex. 38].

Twitter coverage.[38]  Following the trial, Korkmaz capitalized on his notoriety by starting his own YouTube channel.[39]

On January 5, 2025, Korkmaz passed away from cancer.[40]  Shortly after Korkmaz's passing, a U.S.-based Turkish journalist released an hour-long interview where Korkmaz recounted previously untold details about the Turkish police investigation, defended himself against allegations of attempting to overthrow the Turkish government, and divulged his payments to smugglers to flee Türkiye to reach the United States with his stolen evidence.[41]

As with Zarrab, little is known about why U.S. authorities allowed Korkmaz to remain in the United States despite his Turkish criminal history.

## II.    Procedural History

### A.    The U.S. Customs & Border Protection Request

Plaintiff submitted a FOIA request to CBP requesting records relating to Reza Zarrab and Hüseyin Korkmaz in a letter dated August 23, 2021.  Ex. 39 (Initial CBP Request).  CBP closed the request stating that because the request did not include authorization from Korkmaz and Zarrab, information would not be released.  Ex. 40 (CBP Closure dtd. 08/27/2021).  Plaintiff administratively appealed.  Ex. 41 (Plaintiff's First Appeal).  In response, CBP acknowledged that CBP should have substantively processed the request by searching for responsive records and thus granted Plaintiff's appeal.  Ex. 36 (CBP Grants First Appeal).

---

[38] *See, e.g.*, Ex. 35 (Weiser, *Officer Said He Fled*); Ex. 38 (Daily Sabah, *Korkmaz Confesses*); @PeteBrush, X.com (Dec. 13, 2017, 12:15 PM), https://tinyurl.com/3nzph7s3 [Ex. 42].
[39] Arslan, *The Police Man*; Ex. 37 (Decl. of Omer Er).
[40] *Critical Witness of Rıza Sarraf and Halkbank Case, Hüseyin Korkmaz Died in the USA*, Voice of Am. (Jan. 7, 2025), https://tinyurl.com/3tpdc4kk [Ex. 43]; *Rıza Sarraf ve Halkbank Davasının Kritik Tanığı Öldü [Critical Witness in Riza Sarraf and Halkbank Case Dies]*, Cumhuriyet (Jan. 7, 2025), https://tinyurl.com/ywv29tm2 [Ex. 44]; Palmyrah Home for Funerals, *Obituary*, https://tinyurl.com/2us5nw94 [Ex. 45].
[41] Arslan, *The Police Man*; Ex. 37 (Decl. of Omer Er).

On remand, CBP issued Plaintiff an invoice for processing fees in the amount of $5,960, which Plaintiff paid. Ex. 46 (CBP Fee & Payment). Then, in a letter dated October 4, 2022, CBP again denied Plaintiff's FOIA request, stating that a search of CBP databases had "produced records responsive to [Plaintiff's] request" but all documents would be "withheld in full pursuant to Title 5 U.S.C. § 552 (b)(6) [unwarranted invasion of privacy], (b)(7)(C) [same], and (b)(7)(E) [release of records "could provide enterprising computer hackers with information necessary to access and navigate the agency's law enforcement database and alter, add, or delete information contained therein"]." Ex. 47 (CBP Letter dtd. 10/04/2022). Plaintiff administratively appealed CBP's denial, but the decision was affirmed. Ex. 48 (Plaintiff's Second Appeal & Affirmance). Having exhausted all administrative remedies, Plaintiff filed suit on August 9, 2024. ECF 1 (Complaint).

CBP has never produced responsive records nor provided a *Vaughn* index. Notably, despite having previously acknowledged the existence of responsive documents, CBP has asserted during this litigation that it can neither confirm nor deny the existence of responsive documents pursuant to *Glomar* and its progeny. Ex. 49 (Joint Status Report (Nov. 4, 2024)); Ex. 50 (Joint Status Report (Dec. 19, 2024)).

## B.    The U.S. Citizenship & Immigration Services Request

In January 2022, Plaintiff submitted a FOIA request to USCIS asking for documents relating to Reza Zarrab and Hüseyin Korkmaz. Ex. 51 (USCIS Initial Request). USCIS immediately closed Plaintiff's request for failure to provide authorization by the subjects of the records.

In February 2022, Plaintiff filed a second request to USCIS. Ex. 52 (USCIS Request). That same month, USCIS again denied the request pursuant to Exemption 6, stating that the request did not "clear[ly] demonstrat[e] that the public interest in disclosure outweighs the personal

privacy interest(s) of the individual(s) and that significant public benefit would result from the disclosure of the requested records." Ex. 53 (USCIS Zarrab Letter dtd. 02/15/2022); *see* Ex. 54 (USCIS Korkmaz Letter dtd. 02/15/2022). Plaintiff appealed, Ex. 55 (Plaintiff's First Appeal), but USCIS affirmed, Ex. 56 (USCIS Affirms Appeals dtd. 06/10/2022). Having exhausted all administrative remedies, Plaintiff filed suit. ECF 1 (Complaint).

USCIS has never produced responsive records nor provided a *Vaughn* index. *See* Ex. 49 (Joint Status Report (Nov. 4, 2024)); Ex. 50 (Joint Status Report (Dec. 19, 2024)).

### C.    The U.S. Immigration & Customs Enforcement Request

In October 2021, Plaintiff submitted a FOIA request for records to the Department of Homeland Security (DHS) requesting documents pertaining to Reza Zarrab and Hüseyin Korkmaz. *See* Ex. 57 (Initial DHS request). The request was transferred to ICE, *see* Ex. 58 (DHS Letter dtd. 11/03/2021), but ICE responded that no responsive records were found, *see* Ex. 59 (ICE Letter dtd. 12/01/2021).

In January 2022, Plaintiff administratively appealed. *See* Ex. 60 (Plaintiff's ICE Appeal). ICE denied Plaintiff's appeal, stating that "[b]ased on a complete review of the administrative record and the search documentation which led to the determination on your FOIA request, ICE finds the search was adequate in all respects and was reasonably calculated to uncover all relevant documents." Ex. 61 (ICE Appeal Determination). Having exhausted administrative remedies, Plaintiff filed suit. ECF 1 (Complaint).

During this litigation, ICE described its search process. It determined that only the Office of Homeland Security Investigations (HSI)—a division of ICE—was likely to have responsive documents. Ex. 62 (Email from S. Johnson dtd. 12/18/2024). HSI searched the Investigative Case Management (ICM) System, which according to ICE is a "core law enforcement case management tool primarily used by HSI . . . to manage immigration cases that are presented for criminal

prosecution as well as to support its civil immigration enforcement cases." *Id.* It used the following search terms: Reza/Riza Zarrab/Sarraf, and "Huzeyin Korkmaz" (a misspelling of "Huseyin Korkmaz," the name Plaintiff had provided ICE). *Id.* That search yielded no responsive records. The next day, an HSI Management and Program Analyst searched the same system again with the following terms: Reza Zarrab, Riza Zarrab, Reza Sarraf, Riza Sarraf, and Huseyin Korkmaz. The search yielded no responsive records. *Id.*

On January 23, 2025, Plaintiff corresponded with ICE's counsel asking ICE to re-run its search, including using the name "Aaron Goldsmith." Ex. 63 (Email from A. Mendoza dtd. 01/23/2025). But on February 5, 2025, Defendants' counsel informed Plaintiff that "ICE's position has not changed and it intends on defending its search." Ex. 64 (Email from S. Johnson dtd. 02/05/2025).

*    *    *

The chart on the next page is a summary of Defendants' positions:

**Summary of Defendants' Positions**

| Agency | Pre-Litigation Position (Administrative Response) | Litigation Position |
|---|---|---|
| **CBP** | A search of CBP databases "produced records" but those records will be "withheld in full" pursuant to Exemptions:<br>• § (b)(6) & § (b)(7)(C) (unwarranted invasion of privacy)<br>• § (b)(7)(E) (law enforcement techniques and procedures) (release "could provide enterprising computer hackers with information necessary to access and navigate the agency's law enforcement databases and alter, add, or delete information contained therein")<br>Ex. 47 (CBP Letter dtd. 10/04/2022). | The "existence or nonexistence of material requested . . . is exempt from disclosure pursuant to":<br>• § (b)(6) & § (b)(7)(C) (unwarranted invasion of privacy)<br>Ex. 50 (Joint Status Report (Dec. 19, 2024)). |
| **USCIS** | The agency "den[ied] it in its entirety pursuant to":<br>• § (b)(6) (unwarranted invasion of privacy)<br>Ex. 53 (USCIS Zarrab Letter dtd. 02/15/2022); Ex. 54 (USCIS Korkmaz Letter dtd. 02/15/2022); Ex. 56 (USCIS Affirms Appeals dtd. 06/10/2022). | The "existence or nonexistence of material requested" is exempt pursuant to:<br>• § (b)(6) (unwarranted invasion of privacy)<br>Ex. 50 (Joint Status Report (Dec. 19, 2024)). |
| **ICE** | No records found; "the search was adequate in all respects and was reasonably calculated to uncover all relevant documents."<br>Ex. 61 (ICE Appeal Determination). | "ICE previously reported that it searched all areas reasonably calculated to uncover all relevant records, but no records were located."<br>Ex. 50 (Joint Status Report (Dec. 19, 2024)). |

## ARGUMENT

The public has a right to know why CBP, USCIS, and ICE have permitted admitted law-breakers such as Zarrab and Korkmaz to remain in the United States. CBP and USCIS have not only ignored the public's interest in learning what its government is doing, they have also ignored that Zarrab and Korkmaz have thrust themselves (and their criminal histories and immigration statuses) into the public arena by choosing to testify in a high profile trial. Zarrab has minimal privacy interests, if any. Korkmaz, now deceased, has hardly any at all. These agencies have not engaged in any sort of balancing as required by FOIA, but have reflexively and without justification blocked the public's right to know. And ICE failed to conduct an adequate search in the first place.

The governing law here is familiar to this Court. FOIA suits such as this one typically resolve themselves at summary judgment. *Am. Immigr. Council v. U.S. CBP*, 590 F. Supp. 3d 306, 317 (D.D.C. 2022) (R. Contreras, J.). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" factual dispute is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" where it relates to facts that "might affect the outcome of the suit under the governing law." *Id.*

Under FOIA, federal agencies must disclose records unless they fall within one of nine enumerated exemptions, which are "narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation omitted); *see* 5 U.S.C. § 552(b). The agencies bear the burden of showing that a "search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Prop. of the People, Inc. v. OMB*, 330 F. Supp. 3d 373, 380 (D.D.C.

2018) (R. Contreras, J.) (citation omitted).  That is, the agency bears the burden of showing "that each document that falls within the class requested either has been produced . . . or is wholly exempt from [FOIA's] inspection requirements."  *McRae v. U.S. DOJ*, 869 F. Supp. 2d 151, 159 (D.D.C. 2012) (R. Leon, J.) (citations omitted).  The requester's burden "is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur."  *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904-05 (D.C. Cir. 1999) (cleaned up).  In other words, "[e]ven when the requester files a motion for summary judgment," as here, the agencies "ultimately ha[ve] the onus of proving that the documents are exempt from disclosure."  *Id.* at 904 (citation omitted).  The Court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).  FOIA requires courts to "determine the matter de novo," and permits them to "examine the contents of such agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions." *Id.*

## I.      CBP and USCIS Improperly Withheld Records Under FOIA.

CBP and USCIS have both impermissibly withheld records under FOIA.  These agencies have claimed that they cannot confirm or deny the existence of responsive documents pursuant to *Glomar* and its progeny and that responsive documents are exempt from disclosure pursuant to FOIA's privacy exemptions.  CBP has separately alleged that these materials are exempt from disclosure because their release would reveal law enforcement techniques and procedures.  As explained, the agencies' conduct is not in accord with what FOIA demands.

### A.      The *Glomar* Response Issued by CBP and USCIS Is Improper

CBP and USCIS have, during this litigation, asserted a *Glomar* response to Plaintiff's requests, refusing to confirm or deny the existence of responsive records because of the purported

privacy interests at stake. *See* Ex. 49 (Joint Status Report (Nov. 4, 2024)). This response is contrary to law, and is also, at least with respect to CBP, waived.

A *Glomar* response is a "rare" exception to the general rule that agencies must acknowledge the existence of records. *See generally Bartko v. U.S. DOJ*, 898 F.3d 51, 63-64 (D.C. Cir. 2018). It is proper only "in limited circumstances," namely where "the existence or nonexistence of the requested records" is *itself* information protected by an exemption. *Id.* Blanket *Glomar* responses are appropriate only "when the circumstances justify a *Glomar* response for all categories of responsive records." *Project for Priv. & Surveillance Accountability, Inc. v. U.S. DOJ*, 633 F. Supp. 3d 108, 122 (D.D.C. 2022) (R. Contreras, J.) (cleaned up). An agency waives a right to a *Glomar* response if the plaintiff can "show[] that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records." *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013).

Here, CBP waived its right to assert a *Glomar* response when, in October 2022, it advised that its search *had* "produced records responsive to [Plaintiff's] request." Ex. 47 (CBP Letter dtd. 10/04/2022); *see, e.g.*, *ACLU*, 710 F.3d at 428-29 (*Glomar* response inappropriate where subject of request previously acknowledged); *Inst. for Pol'y Stud. v. CIA*, 885 F. Supp. 2d 120, 141 (D.D.C. 2012) (R. Lamberth, J.) (similar). But even setting aside waiver, both agencies' *Glomar* objections remain meritless. A *Glomar* response is appropriate if it appears "logical or plausible" that acknowledgement would harm Zarrab's and Korkmaz's privacy interests in the existence or non-existence of responsive documents (not the content of those documents). *See ACLU*, 710 F.3d at 428-29 (citation omitted). Here, neither agency has provided any explanation, much less a "logical" or "plausible" one, for their *Glomar* responses. Nor is there one: It is illogical and implausible to think that high profile figures such as Zarrab and Korkmaz could enter and remain

17

in the United States without having contacts with CBP and USCIS. It has already been publicly reported that CBP was involved with Zarrab's arrest. *See supra* p.3. To submit that the mere acknowledgment of records in CBP's possession would now run afoul of Zarrab's privacy interests is simply not credible. And with respect to USCIS, it would appear that USCIS has issued employment cards to both Zarrab, *supra* p.8, and Korkmaz, *supra* p.9.[42] These circumstances, coupled with the fact that both Zarrab and Korkmaz have acknowledged in public proceedings that they are not citizens, renders each agency's *Glomar* response inappropriate.

Finally, even setting these points aside, the agencies have still failed to carry their "burden of explaining why disclosure of any records would categorically be reasonably expected to constitute an unwarranted invasion of . . . personal privacy, when balanced against the public interest in disclosure." *Bartko*, 898 F.3d at 66 (cleaned up). As we explain, the public interest in understanding what our government is up to outweighs Zarrab's and Korkmaz's minimal (if any) privacy interests.

### B.  CBP and USCIS Are Improperly Withholding Documents with Respect to Reza Zarrab Pursuant to FOIA's Privacy Exemptions

CBP and USCIS have both invoked Exemption 6—either to withhold documents or to invoke *Glomar*. Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a *clearly unwarranted* invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added). CBP has separately invoked Exemption 7(C), which applies to "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an *unwarranted* invasion of personal privacy." *Id.* § 552(b)(7)(C) (emphasis added). The nature of both exemptions—in particular, Congress's focus

---

[42] USCIS, Employment Authorization Document, https://tinyurl.com/4h7cfpyf (last updated June 7, 2024).

on whether the resulting intrusion amounts to an "unwarranted" invasion—requires the Court to "balance the public interest in disclosure against the [privacy] interest Congress intended the Exemption to protect." *ACLU v. U.S. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).  As we explain, neither exemption applies.[43]

"[C]ourts employ a similar analysis to decide whether a FOIA request may be categorically denied on either ground." *Citizens for Resp. & Ethics in Wash. v. U.S. DOJ*, 840 F. Supp. 2d 226, 230-31 (D.D.C. 2012) (G. Kessler, J.).[44]  *First*, courts "assess whether the third-party has more than a *de minimis* privacy interest in the requested material." *Id.* at 231.  *Second*, "[i]f such an interest exists, the court must then determine whether the third-party's privacy interest is outweighed by the public interest in disclosure." *Id.*; *see Am. First Legal Found. v. U.S. DHS*, No. 21-2168, 2024 WL 4932041, at *6 (D.D.C. Dec. 2, 2024) (R. Moss, J.) (noting that the public interest must be "significant" and the information sought must advance that interest (citation omitted)).  Here, as explained below, Zarrab's privacy interest in his immigration records is minimal at best, and what remains of that privacy interest is substantially outweighed by the public's right to know "what their government is up to." *Roth v. U.S. DOJ*, 642 F.3d 1161, 1177 (D.C. Cir. 2011) (citation omitted).

---

[43] Aside from withholding records to protect the privacy of Zarrab and Korkmaz, CBP also claims to withhold records to protect CBP and other law enforcement employees from "harassment and annoyance."  Ex. 48 (Plaintiff's Second Appeal & Affirmance).  But CBP can easily redact the names of these employees, rather than withhold the documents wholesale—a policy that is much more consistent with why FOIA exists in the first place. *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734-35 (D.C. Cir. 2008).

[44] The difference between the exemptions is in the "magnitude of the public interest that is required" to overcome the privacy interests involved. *U.S. DOD v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 496 n.6 (1994).  Exemption 7(C) will protect more records than Exemption 6 given that Exemption 6 requires a "clearly unwarranted" invasion of privacy to justify nondisclosure, rather than the "could reasonably be expected" standard imposed by Exemption 7(C). *Id.*  Here, because Plaintiff overcomes Exemption 7(C), it necessarily overcomes Exemption 6 as well.

### 1.    Reza Zarrab's Privacy Interests Are Minimal at Best

At the threshold, Zarrab's privacy interests with respect to his immigration records are effectively non-existent, if such interests exist at all.  Zarrab is a public figure who has already voluntarily thrust his private life—and immigration status—into the public sphere through conduct, including agreeing to testify at Mr. Atilla's high-profile trial.  Indeed, he was a public figure long before his arrest in the United States.  *See supra* pp.2-3.  Collectively, these circumstances render his privacy interests minimal at best.

The law is clear that "[o]ne can have no privacy interest in information that is already in the public domain, especially when the person asserting his privacy is himself responsible for placing that information into the public domain."  *Citizens for Resp. & Ethics in Wash.*, 840 F. Supp. 2d at 233 (G. Kessler, J.).  Here, Zarrab himself admitted during the *Atilla* trial that he is a citizen of Iran, Türkiye, and North Macedonia and that he entered the United States in March 2016.  *See generally* Ex. 15 (*Atilla* Tr. (Zarrab)).  Press reports discuss CBP's involvement in Zarrab's arrest when he entered the United States.[45]  Additionally, Zarrab's employment authorization card, which reveals that Zarrab was granted work authorization under the category "C14," is also widely available on a website funded in part by the U.S. Government.[46]  Zarrab publicly pleaded guilty to multiple felonies, which typically require deportation.  *See infra* pp.23-24.  Given these circumstances, his privacy interests with respect to his immigration records is negligible.

Zarrab's status as a public figure only reinforces that conclusion.  Courts have routinely held that in the context of Exemptions 6 and 7(C), public figures have diminished privacy interests.  *See Rosenfeld v. U.S. DOJ*, No. C-07-3240 EMC, 2012 WL 710186, at *5 (N.D. Cal. Mar. 5, 2012) (E. Chen, J.) ("[P]ersons who have placed themselves in the public light, e.g., through politics, or

---

[45] Ex. 12 (Neumeister, *Lawyer*).
[46] Ex. 33 (*OCCRP ID: How Our Research Team Supports*).

voluntarily participate in the public arena have a significantly diminished privacy interest than others."); *see also Jud. Watch, Inc. v. U.S. DOJ*, 394 F. Supp. 3d 111, 118 (D.D.C. 2019) (C. Cooper, J.) (diminished privacy interest where subject "is not presently unknown to the world" and instead "has already been thrust into the spotlight because of his relationship with the FBI"); *Jud. Watch, Inc. v. U.S. DOJ*, No. 00-745, 2001 U.S. Dist. LEXIS 25731, at *13 (D.D.C. Feb. 12, 2001) (T. Hogan, J.) ("[P]ardoned prisoners have arguably become public figures through their well-publicized pleas for clemency and the speeches some have made[.]").

Here, as we have described in detail, Zarrab is certainly not "unknown to the world." *Jud. Watch*, 394 F. Supp. 3d at 118 (C. Cooper, J.). Indeed, "[a]nyone who bothers Googling his name can get their hands" on the details of his "crimes." *Muchnick v. DHS*, 225 F. Supp. 3d 1069, 1076 (N.D. Cal. 2016) (C. Breyer, J.). Nor did he fall into the public limelight by happenstance. He first sought fame and status as a public figure in Türkiye when he began dating Ebru Gündeş and flaunted his wealth. Then, he agreed to serve as a star witness in *Atilla* in exchange for benefits from the U.S. Government. *See, e.g.*, *Providence J. Co. v. FBI*, 460 F. Supp. 778, 790-91 (D.R.I. 1978) (R. Pettine, J.) ("Public officials have made a willing choice to enter the public fray and are held to have accepted the consequences. The same is true of the public figure who voluntarily or involuntarily enters the public arena."), *rev'd on other grounds*, 602 F.2d 1010 (1st Cir. 1979).

Zarrab remains a public figure today. His lifestyle is routinely covered by numerous media outlets across the world.[47] His status as a public figure who has voluntarily thrust his life—including his immigration status—into the public domain, renders any privacy interest he may have in his immigration records negligible at best.

---

[47] *See, e.g.*, Ex. 3 (Bloss et al., *Money Launderer for Iran*); Ex. 17 (BBC, *Turkey Seizes Assets of Trader*).

### 2.    There Is a Substantial Public Interest in Disclosure

Because Zarrab's privacy interests in the requested records are effectively non-existent, when balanced against the public's substantial interest in disclosure, the public's interest plainly wins out.

With respect to FOIA's privacy exemptions, "[t]he public interest that must be weighed . . . is the extent to which disclosure advances the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny." *ACLU*, 655 F.3d at 6. "[T]here is no requirement that a FOIA requester must always allege that the Government is acting illegally in order to establish the existence of a substantial public interest." *Citizens for Resp. & Ethics in Wash.*, 840 F. Supp. 2d at 235-36 (G. Kessler, J.); *see Citizens for Resp. & Ethics in Wash. v. U.S. DOJ (CREW III)*, 746 F.3d 1082, 1095 (D.C. Cir. 2014). Instead, the inquiry "focuses on . . . the citizens' right to be informed about what their government is up to." *Roth*, 642 F.3d at 1177 (cleaned up).

Courts across the country have ordered a search for or release of records even where a privacy interest exists. *See, e.g.*, *Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1224 (9th Cir. 2001) (ordering disclosure of incident where Customs Service arrested and detained two police officers for smuggling steroids given a public interest in understanding whether officers were afforded preferential treatment); *Jud. Watch*, 394 F. Supp. 3d at 118 (C. Cooper, J.) (requiring search of records for an individual who has been "thrust into the spotlight because of his relationship with the FBI"); *Rosenfeld*, 2012 WL 710186, at *4 (E. Chen, J.) (requiring release of documents concerning traffic violations and arrests of undisclosed party associated with President Ronald Reagan); *Bennett v. DEA*, 55 F. Supp. 2d 36, 42 (D.D.C. 1999) (G. Kessler, J.) (ordering release of DEA informant's rap sheet given public interest in exposing government wrongdoing); *see also Iowa Citizens for Cmty. Improvement v. USDA*, 256 F. Supp. 2d 946, 954-57 (S.D. Iowa

2002) (R. Longstaff, J.) (ordering release of documents related to public figure and nominee for Undersecretary of Agriculture for Rural Development); *Jud. Watch*, 2001 U.S. Dist. LEXIS 25731, at *13 (T. Hogan, J.) (denying summary judgment to the Executive Office for United States Attorneys under Exemption 7(C) because the public interest outweighed the privacy interests of pardoned Puerto Rican separatists who had "arguably become public figures" given their well-publicized pleas for clemency and speeches). These principles have been applied to immigration records as well. *See Muchnick*, 225 F. Supp. 3d at 1075-78 (C. Breyer, J.) (requiring release of former coach of the Irish Olympic swim team's immigration records because his alleged crimes were publicly known).

Here, there is a substantial public interest in the disclosure of Zarrab's immigration records and the release of those records would further that interest. *See Am. First Legal Found.*, 2024 WL 4932041, at *6 (R. Moss, J.). Put simply, "the public has a strong interest in understanding how and why their government allowed a man with a far-worse-than-checkered past (and perhaps present) to stay here for" so long. *Muchnick*, 225 F. Supp. 3d at 1077 (C. Breyer, J.). In other words, release of Zarrab's records will reveal whether this country's immigration agencies fulfilled their duties. With respect to Zarrab, after all, it is public knowledge that U.S. authorities have not deported him despite his pleading guilty to a slew of federal offenses that could subject him to decades in prison.

The balancing test shifts further against the agencies when one considers that noncitizens who have pleaded guilty to certain crimes are generally deemed "inadmissible," or ineligible to remain in the United States. Section 1182(a)(2)(A)(i)(I) of the Immigration Nationality Act explicitly provides that "any [noncitizen] . . . who admits having committed . . . a crime involving moral turpitude . . . or an attempt or conspiracy to commit such a crime . . . is inadmissible." This

federal statute is directly applicable here because Zarrab has pleaded guilty to bank fraud, conspiracy to commit bank fraud, and conspiracy to defraud the United States, among other crimes, which are crimes involving moral turpitude. *See, e.g.*, *Jordan v. De George*, 341 U.S. 223, 229 (1951) ("[T]he crime of conspiring to defraud the United States is a crime involving moral turpitude." (cleaned up)). Here, Zarrab faces decades in prison for crimes involving moral turpitude. His immigration records would shed light on why DHS permitted him to remain in the United States and whether the immigration agencies are performing their duties appropriately.

In this respect, this case is on all fours with *Muchnick*. The plaintiff there sought immigration files for the former coach of the Irish Olympic swim team, George Gibney, who had been charged with multiple counts of sexual abuse of young female swimmers. *Muchnick*, 225 F. Supp. 3d at 1073 (C. Breyer, J.). Gibney left Ireland and moved to Florida after the Irish Supreme Court held that the statute of limitations had run on his crimes. *Id.* Just as in Zarrab's case, Gibney's alleged crimes were widely reported in the media, but when a request was made for Gibney's immigration records on the basis that DHS engaged in misconduct in admitting Gibney and allowing him to reside in the United States, DHS refused to disclose all of his records. *Id.* at 1074. The court nevertheless ordered disclosure, reasoning that the requested information would "shed[] light on multiple decisions by multiple DHS personnel," including "what they knew about Gibney's past and when they knew it." *Id.* at 1076-77. "Those details," the court reasoned, "shed light on DHS's performance of its statutory duties and most certainly lets citizens know 'what their government is up to.'" *Id.* at 1077 (citation omitted).

So too here. "[M]atters of substantive law enforcement policy . . . are properly the subject of public concern," and the release of Zarrab's records "would likely reveal a great deal about law enforcement policy." *CREW III*, 746 F.3d at 1093 (cleaned up); *see also Phillips v. ICE*, 385 F.

Supp. 2d 296, 305-06 (S.D.N.Y. 2005) (R. Holwell, J.) (holding that "it is a legitimate inquiry to ask via FOIA what INS knew of [two] generals' alleged roles at the time it granted them admission to or asylum in the United States" after they were "publicly accused of complicity in notorious human rights violations").[48]

CBP's and USCIS's handling of Zarrab's case, to be sure, may be "only one data point regarding the performance of [their] statutory duties, [but] it is a significant one." *CREW III*, 746 F.3d at 1094. Zarrab's file will shed light on whether the "prominent" and financially connected "are subjected to the same investigative scrutiny and prosecutorial zeal as" those who are not. *Id.* If these agencies have exercised discretion in an unfair way by allowing an admitted noncitizen felon to live among the American public while other immigrants are deported for much lesser offenses, the public has a right to know why. That right more than outweighs any privacy interests Zarrab may have in those same materials.[49]

---

[48] In light of the parallels between this case and *Muchnick*, Judge Nichols' recent decision in *Heritage Found. v. U.S. DHS*, No. 1:23-cv-01198, 2024 WL 4263929, at *1 (D.D.C. Sept. 23, 2024) (C. Nichols, J.), which declined to release the Duke of Sussex's (Prince Harry) immigration records, is readily distinguishable. Judge Nichols distinguished *Muchnick* on the grounds that the swim coach there "had virtually no privacy interest in his records," which was not the case with respect to the Duke. *Id.* at *6. He cited language from *Muchnick* noting that "[a]nyone who bothers Googling [Muchnick's] name can get their hands on the sordid details of his alleged crimes." *Id.* (quoting *Muchnick*, 225 F. Supp. 3d at 1076). Here, unlike in *Heritage Foundation*, Zarrab's privacy interests are negligible at best because like the swim coach in *Muchnick*, the details of Zarrab's crimes and his immigration status are readily available. Just as in *Muchnick*, "the public has a strong interest in understanding how and why their government allowed a man with a far-worse-than-checkered past (and perhaps present) to stay here." 225 F. Supp. 3d at 1076-77 (C. Breyer, J.).

[49] As noted, because Plaintiff overcomes Exemption 7(C), it necessarily overcomes Exemption 6, which only applies when disclosure would amount to a "clearly unwarranted" invasion of privacy. 5 U.S.C. § 552(b)(6). Should the Court disagree, Plaintiff has certainly established that the disclosure of Zarrab's immigration records would not amount to a "clearly unwarranted" invasion of privacy. Thus, the Court should order production of records in USCIS's possession even if it concludes that CBP may withhold documents pursuant to Exemption 7(C).

### C.    CBP & USCIS Are Improperly Withholding Documents with Respect to Hüseyin Korkmaz Pursuant to FOIA's Privacy Exemptions

CBP and USCIS have failed to comply with FOIA by improperly withholding documents with respect to Hüseyin Korkmaz pursuant to FOIA's privacy exemptions.  Plaintiff initially filed its FOIA request with respect to Korkmaz's immigration records while he was alive, but he has since passed away.   In light of this development and resulting diminished privacy interest, Korkmaz's immigration records should be produced promptly.

### 1.    Hüseyin Korkmaz's Privacy Interests Are Diminished to Non-Existent

The D.C. circuit has long recognized "that the privacy interest in nondisclosure of identifying information may be diminished where the individual is deceased." *Schrecker v. U.S. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003); *see Campbell v. U.S. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998) ("[D]eath clearly matters, as the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living."); *see also Davis v. DOJ*, 460 F.3d 92, 95-98 (D.C. Cir. 2006) (M. Garland, J.).  For this reason, DHS routinely releases individuals' immigration records following their death.  By way of example, after the death of Amalija Knavs—First Lady Melania Trump's mother—USCIS released over one hundred pages of Ms. Knavs's immigration records including her application for naturalization, certificate of naturalization, permanent resident card, and passport.  *Heritage Found. v. U.S. DHS*, No. 23-cv-1198 (D.D.C. filed May 1, 2023) (C. Nichols, J.), ECF Nos. 51-2, 51-3.  In fact, USCIS maintains a repository titled "A-Files of Notable People" on its website, which contains immigration records for people like Elizabeth Taylor (deceased actress who migrated from the United Kingdom), Tamerlan Tsarnaev (deceased Boston marathon bomber), and Mikhail Gorshkow (deceased alleged Nazi war criminal).[50]  By the same logic, in light of Korkmaz's death, there is no reason why the agency should continue to withhold

---

[50] USCIS, Electronic Reading Room, https://tinyurl.com/ ycke3f4x (last visited Feb. 13, 2025).

responsive documents to protect his privacy.

That is especially so in light of the fact that Korkmaz had already publicly disclosed a great deal of information about his journey to the United States prior to his death. Korkmaz was involved in a major law enforcement operation in Türkiye long before he ever arrived in the United States. He then absconded from Türkiye with stolen evidence and used a fake passport to enter the United States and deliver that evidence to U.S. authorities. He agreed to testify over the course of four days in a high-profile trial, presumably for benefits. At that time, he discussed his flight from his native Türkiye to the United States, recounting how he hired a smuggler to leave Türkiye, traveled through a series of countries without authorization, and then lied to immigration authorities in an unknown country to obtain a passport with a fake name. Ex. 1 (*Atilla* Tr. at 1388-92 (Korkmaz)). Korkmaz further testified that he received work authorization to obtain employment in the United States, despite these lies. *Id.* at 1564-65. Prior to his death, Korkmaz also discussed his immigration to the United States in a tell-all interview with a member of the Turkish press.[51] In short, he himself already made details of his immigration history public. Accordingly, (and especially in light of his passing) he no longer retains a meaningful privacy interest in this information.[52]

### 2. There Is a Substantial Public Interest in Disclosure

In any event, the public's substantial interest in disclosure outweighs any privacy interests. As with Zarrab's records, the public has an interest in understanding whether CBP and USCIS acted inappropriately in admitting Korkmaz into the United States given that he used a passport to enter the country that was not in his true name. The public also has an interest in understanding

---

[51] Arslan, *The Police Man*; Ex. 37 (Decl. of Omer Er).
[52] Plaintiff consents to USCIS and CBP redacting Korkmaz's immigration records in order to protect the privacy interests of third parties, including Mr. Korkmaz's immediate family members.

how Defendants exercise official discretion in cases involving individuals with a "checkered past." *Muchnick*, 225 F. Supp. 3d at 1077 (C. Breyer, J.).  Once again, prior to entering the country, Korkmaz was charged with multiple crimes in Türkiye and fled before trial.[53]  Americans and those who immigrate here—including those who have either meticulously complied with DHS's requirements to obtain their immigration status or who have had their statuses revoked for doing much less than Korkmaz—have an interest in knowing if USCIS and CBP acted appropriately and fairly in allowing Korkmaz to enter the country and why they continued to allow him to remain in the country after he admitted to conduct that would be disqualifying for others.

### D.     Defendant CBP May Redact Information Subject to Exemption 7(E)

CBP has also withheld portions of some documents under Exemption 7(E), noting that production of "case file numbers, file locations, and other unique identifiers . . . could provide enterprising computer hackers with information necessary to access and navigate the agency's law enforcement databases and alter, add, or delete information contained therein." Ex. 48 (Plaintiff's Second Appeal & Affirmance).  Plaintiff consents to this information being redacted, which is more than sufficient to address CBP's concerns and consistent with the underlying purposes of FOIA.  *See McRae*, 869 F. Supp. 2d at 169 (R. Leon, J.) (redactions of "codes, case numbers, and other computer information" appropriate).

## II.     CBP and USCIS Have Failed to Perform an Adequate Segregability Analysis.

CBP and USCIS have also violated FOIA by failing to produce all "reasonably segregable portion[s]" of the exempted documents.  5 U.S.C. § 552(b).  Even if an agency establishes an exemption under FOIA, it is still required to disclose all reasonably segregable, nonexempt portions of the records, unless the nonexempt portions are "inextricably intertwined with exempt

---

[53] Murat Paksoy, *Turkey Seeks Extradition of FETO Fugitive from US*, Anadolu Agency (Jan. 5, 2018), https://tinyurl.com/23b3h2ay [Ex. 65].

portions." *Mead Data Cent. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977); *see Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002). To establish that all reasonably segregable, non-exempt information has been disclosed, the agency must show "with reasonable specificity" that the information withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578-80 (D.C. Cir. 1996). Courts err when they simply approve the withholding without entering a finding on segregability or the inability to segregate. *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

Here, even if some portions of some documents are exempt from disclosure (they are not), the agencies have still failed to produce those portions of the documents that are not exempt from disclosure. It defies credibility to claim that all documents and all portions of those documents fall within an exemption. *See Hamdan v. U.S. DOJ*, 797 F.3d 759, 779 (9th Cir. 2015) ("The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed."). For this reason also, CBP and USCIS have run afoul of what FOIA requires.

## III.    ICE Failed to Conduct an Adequate Search.

ICE could not have adequately searched for responsive records as it claims. It did not reasonably identify and search the offices or databases likely to contain responsive documents and unreasonably limited search terms aimed at identifying those documents. The fact that Plaintiff can point to circumstances that make the existence of documents in ICE's possession a near certainty only further supports the contention that the agency's searches did not meet expectations.

"[A]n agency responding to a FOIA request must conduct a search reasonably calculated to uncover all relevant documents, and, if challenged, must demonstrate beyond material doubt that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (cleaned up). A search need not be perfect, but "the agency must show that it made a good faith

effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (citation omitted). The agency falls short of its obligations when, "particularly in view of well defined requests and positive indications of overlooked materials," there is "substantial doubt" as to the adequacy of the search. *Id.* (cleaned up); *see also Truitt*, 897 F.2d at 542. Case law requires that the agency make "more than perfunctory searches" and requires agencies to "follow through on obvious leads to discover requested documents." *Valencia-Lucena*, 180 F.3d at 325-26.

Under these standards, there can be no genuine dispute that ICE's searches were inadequate. To start, ICE failed to search the locations likely to contain responsive records. Upon receiving Plaintiff's FOIA requests, ICE tasked just *one* office, HSI, with conducting searches for responsive records. Ex. 62 (Email from S. Johnson dtd. 12/18/2024). And that office searched just *one* database, the Investigative Case Management (ICM) System. *Id.* Even if it were reasonable to begin the search at that one office and with that one database, when that office and that database failed to locate records, ICE was obligated to do more. It "cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Valencia-Lucena*, 180 F.3d at 326 (citation omitted).

Other databases are certainly plentiful. In this case, for instance, ICE should have searched other databases and repositories that may contain information on noncitizens who enter, reside, or are granted deferred action, including "ICE ENFORCE," *Gahagan v. U.S. CBP*, No. CIV.A. 14-2619, 2015 WL 3772888, at *11 (E.D. La. June 17, 2015); "IDENT," which stores biometric information, including photographs and fingerprints; "Enforcement Integrated Database," which is known to house "information related to the investigation, arrest, booking, detention, and removal

of persons encountered during immigration and criminal law enforcement investigations and operations"; the Data Analysis System (containing, among other things,  immigration and criminal histories); IDOCX (assisting in the collection, analysis, and translation of collected documents); the Electronic Surveillance System (ESLUR) (storing court orders allowing ICE to intercept communications); FALCON-SA (storing and facilitating the analysis of existing information to help ICE fulfill its enforcement functions); the Visa Security Program Tracking System (recording, tracking, and managing all visa security reviews performed by ICE); and the Automated Threat Prioritization Web Service (receiving, processing, and transmitting criminal history information).[54]  "ICE has produced data from [the Enforcement Integrated Database] in recent cases," and there is no reason it should not search that database in this case as well.  *Am. Immigr. Council v. U.S. ICE*, 464 F. Supp. 3d 228, 242 (D.D.C. 2020) (A.B. Jackson, J.) (finding ICE's search inadequate for failure to search the Enforcement Integrated Database, which contains "information related to the investigation, arrest, booking, detention, and removal of persons encountered"); *see also New Orleans Workers' Ctr. for Racial Just. v. U.S. ICE*, 373 F. Supp. 3d 16, 39 (D.D.C. 2019) (R. Walton, J.) (denying ICE's motion for summary judgment for failure to search several databases for Criminal Alien Removal Initiative data).  Moreover, because Zarrab's

---

[54]    *DHS/OBIM/PIA-001  Automated  Biometric  Identification  System*, DHS, https://tinyurl.com/452zy6kz (last updated March 31, 2023); *DHS/ICE/PIA-015 Enforcement Integrated Database*, DHS, https://tinyurl.com/5n82dspp (last updated Mar. 31, 2023); DHS, Privacy  Impact  Assessment  Update  for  the  Enforcement  Integrated  Database, https://tinyurl.com/yr6mxumb (May 14, 2019); *DHS/ICE/PIA-048 Data Analysis System (DAS)*, DHS, https://tinyurl.com/mrx2kma2 (last updated Mar. 31, 2023); DHS, *Privacy Impact Assessment for the IDOCX System*, https://tinyurl.com/2a7jhhdc (Oct. 14, 2019); *DHS/ICE/PIA-024 Electronic Surveillance System*, DHS, https://tinyurl.com/49r5bfma (last updated Mar. 31, 2023); *DHS/ICE/PIA-032 FALCON Search & Analysis System (FALCON-SA)*, DHS, https://tinyurl.com/yck6ux9c (last updated Mar. 31, 2023); *DHS/ICE/PIA-011 - Visa Security Program Tracking System (VSPTS-Net)*, DHS, https://tinyurl.com/24vbr48t (last updated Mar. 31, 2023); *DHS/ICE/PIA-028  Automated  Threat  Prioritization  Web  Service*, DHS, https://tinyurl.com/52ftw9c5 (last updated Mar. 31, 2023).

plea agreement specifically indicated that the U.S. Attorney's Office would reach out to ICE regarding Zarrab, Ex. 66 (Zarrab Plea Agreement), ICE should have also searched email correspondence, including custodians likely to correspond with the U.S. Attorney's Office. *See Organized Cmtys. Against Deportations, Immigr. Def. Project v. U.S. ICE*, No. 21-CV-2519, 2024 WL 2053123, at *6 (N.D. Ill. May 8, 2024) (J.R. Blakey, J.) (denying summary judgment for ICE where the agency "did not act upon reasonable and obvious leads provided by Plaintiffs to discover relevant documents").

Nor did ICE use reasonable search terms. Courts have routinely found searches inadequate where they have not accounted for multiple permutations of a name and failed to search variations of a name. *Am. Oversight v. DHS*, 691 F. Supp. 3d 109, 115 (D.D.C. 2023) (T. McFadden, J.) (granting summary judgment to plaintiff and finding ICE's search inadequate because it only searched detainees' full names); *Gov't Accountability Project v. U.S. DHS*, 335 F. Supp. 3d 7, 11-13 (D.D.C. 2018) (C. Cooper, J.) (granting summary judgment to plaintiff and finding DHS's search inadequate for failing to search obvious permutations of requested terms, such as "cell phone" instead of just "cellphone"); *Bagwell v. U.S. DOJ*, 311 F. Supp. 3d 223, 229-30 (D.D.C. 2018) (C. Cooper, J.) (finding a search inadequate for failing to search common abbreviations of requested terms, such as "PSU" or "Penn State" for "Pennsylvania State University" (citation omitted)). ICE could have also very easily searched for phonetic variations of the names provided. *Jud. Watch, Inc. v. U.S. Dep't of State*, No. CV 20-1729, 2022 WL 4094069, at *7 (D.D.C. Sept. 7, 2022) (T. Kelly, J.) (denying summary judgment to agency due to failure to search "obvious permutations" of individual's name); *see Owen v. U.S. ICE*, No. 2:22-cv-00550, 2024 WL 5339162, at *3 (C.D. Cal. Nov. 12, 2024) (D. Fischer, J.) (finding ICE's search inadequate because it failed to "search variations" in the requested names).

Here, Plaintiff specifically provided ICE with a list of names, including "Reza Zarrab" (and his date of birth) and "Huseyin Korkmaz," it explained that these individuals were mentioned in *Atilla*, Case No. 15-867-RMB, and it specifically requested that common derivates be searched to account for any possible typographical errors in records. Ex. 60 (Plaintiff's ICE Appeal). But, as is relevant here, ICE initially performed nothing but a cursory search for the terms "Reza/Riza Zarrab/Sarraf," and "Huzeyin Korkmaz" [*sic*]. Ex. 62 (Email from S. Johnson dtd. 12/18/2024). Although ICE searched for the names Plaintiff provided (at least with respect to Zarrab), ICE failed to search obvious permutations or phonetic spellings of the requested terms, such as "RezaZarrab," "Reesa," "Zarab," "HuseyinKorkmaz," or "Hossein." *See Ryan v. FBI*, 113 F. Supp. 3d 356, 367 (D.D.C. 2015) (T. Chutkan, J.) (discussing phonetic searches). Nor did ICE search for the date of birth that Plaintiff provided or attempt to discern any helpful information from the case citation provided. Indeed, its search was so perfunctory, that it even misspelled "Huseyin Korkmaz" using a "z" instead of an "s" in its first search. And importantly, inadequacies were not rectified in their second search the next day as again, ICE merely searched "Reza Zarrab, Riza Zarrab, Reza Sarraf, Riza Sarraf," and "Huseyin Korkmaz" without more. Ex. 62 (Email from S. Johnson dtd. 12/18/2024). These terms were totally inadequate given the information Plaintiff provided to ICE.

The fact that responsive documents with respect to both Zarrab and Korkmaz most assuredly exist within ICE's databases raises substantial doubt that ICE's search was adequate. That is, in light of these "positive indications of overlooked materials," there is "substantial doubt" that the searches were reasonable. *Valencia-Lucena*, 180 F.3d at 326 (citations omitted). Zarrab's publicly available plea agreement, for instance, specifically mentions ICE, stating expressly that the U.S. Attorney's Office would "bring the cooperation of the defendant, as well as any safety concerns . . . to the attention of ICE" and that the office "will take steps to bring any known safety

concerns to the attention of the appropriate authorities, including ICE." Ex. 66 (Zarrab Plea Agreement). Public reporting also shows that Zarrab received an employment authorization card, which beyond identifying Zarrab under the alias "Aaron Goldsmith" (a term ICE did not search despite Plaintiff's request, *see* Ex. 63 (Email from A. Mendoza to S. Johnson dtd. 01/23/2025)), was issued under code "C14" for "deferred action"—an immigration category typically authorized by ICE.[55]

The same is true for Hüseyin Korkmaz. The circumstances of his travel—namely, that he traveled without authorization through various countries before entering the United States on a false passport—overwhelmingly suggest that ICE maintains responsive records, at least with respect to his entry into the United States. *See* Ex. 1 (*Atilla* Tr. at 1383-84, 1389-92 (Korkmaz)).[56]

Collectively, these circumstances demonstrate that ICE's searches were not reasonable. The agency used only a handful of search terms while searching only a single database. FOIA demands more. *See Valencia-Lucena*, 180 F.3d at 327 (noting an agency "abdicat[ed] its duty under FOIA" for failing to search additional locations for responsive documents). In light of these obvious deficiencies, the Court should grant Plaintiff's motion for summary judgment and order that ICE immediately conduct additional searches reasonably tailored to uncover responsive records.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment should be granted.

---

[55] Ex. 33 (*OCCRP ID: How Our Research Team Supports*).
[56] Ex. 35 (Weiser, *Officer Said He Fled*).

Dated: February 14, 2025

Respectfully submitted,

*/s/ Robert M. Cary*
Robert M. Cary (431815)
Simon A. Latcovich (980319)
Samuel Lazerwitz (90006489)
Anahi D. Mendoza Pacheco (90022643)

WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5175
Facsimile: (202) 434-5029
Email:  RCary@wc.com

*Attorneys for Plaintiff Williams & Connolly LLP*